UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JENAIL H. NEWTON, | Case No. 2:18-cv-00971-GMN-EJY |
| Plaintiff, | |
| | **REPORT AND RECOMMENDATION** |
| v. | |
| ANDREW SAUL, Acting Commissioner of Social Security,[1] | Re:  Motion for Remand (ECF No. 17) |
| Defendant. | |

Plaintiff Jenail Newton ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or the "Agency") denying her application for disability insurance ("DIB") under Title II of the Social Security Act.  For the reasons stated below, it is recommended that the Commissioner's decision be affirmed.

## I.    BACKGROUND

On March 18, 2014, Plaintiff filed an application for DIB alleging an amended onset date of disability beginning February 2, 2012.[2]  Administrative Record ("AR") 48, 215–18.  The Commissioner denied Plaintiff's claims by initial determination on September 4, 2014, and again upon reconsideration on March 19, 2015.  AR 135–38, 140–41.  On May 18, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 142–43.  After conducting a hearing on September 28, 2016 (AR 43–73), ALJ John Cusker issued his determination that Plaintiff was not disabled on March 29, 2017 (AR 18–34).  Plaintiff timely requested that the Appeals Council review the decision by the ALJ, but the Appeals Council denied that request on March 22, 2018.

---

[1]    Andrew Saul is the current Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2]    Plaintiff initially alleged disability beginning December 31, 2009, but later amended her onset date of disability to February 2, 2012.  AR 21, 48.

AR 1–6.  When the Appeals Council denied Plaintiff's request for review, the ALJ's March 29, 2017 decision became the final order of the Commissioner.[3]  This civil action followed.

## II.    STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on correct legal standards and the legal findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In reviewing the Commissioner's alleged errors, the Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986) (internal citations omitted).

"When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198, *citing Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  A reviewing court, however, "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal citation omitted).  Finally, the court may not reverse an ALJ's decision on account of an error that is harmless. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

---

[3]    All references contained herein are to the 2017 regulations in effect at the time of the Commissioner's final decision, dated March 29, 2017.

# III.   DISCUSSION

## A.   Establishing Disability Under The Act

To establish whether a claimant is disabled under the Act, there must be substantial evidence that:

(a)    the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and

(b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999), *citing* 42 U.S.C. § 423(d)(2)(A).  "If a claimant meets both requirements, he or she is disabled." *Id.*

The ALJ employs a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(a).  Each step is potentially dispositive and "if a claimant is found to be 'disabled' or 'not-disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (internal citation omitted); 20 C.F.R. § 404.1520.  The claimant carries the burden of proof at steps one through four, and the Commissioner carries the burden of proof at step five. *Tackett*, 180 F.3d at 1098.

The five steps are:

Step 1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(b).

Step 2.  Is the claimant's impairment severe?  If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(c).

Step 3.  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(d).

Step 4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(e).

Step 5.  Is the claimant able to do any other work?  If not, then the claimant is "disabled" and therefore entitled to disability insurance benefits.  *See* 20 C.F.R. § 404.1520(f)(1).  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert [("VE")], or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits.  *See* 20 C.F.R. §§ 404.1520(f), 404.1562.  If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to disability benefits.  *See id.*

*Id.* at 1098–99 (internal alterations omitted).

**B.    Summary of ALJ's Findings**

At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity since February 2, 2012 the amended alleged onset date of disability, through her date last insured of September 30, 2015.  AR 24.  At step two, the ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "degenerative disc disease of the lumbar spine," and non-severe impairments consisting of "carpal tunnel syndrome ['CTS'], epicondylitis, obesity, . . . migraine headaches[, and] unspecified depressive disorder."[4]  AR 24–25.  At step three, the ALJ found that Plaintiff's impairment did not meet or equal any "listed" impairment in 20 C.F.R., Part 404, Subpart ("Subpt.") P, Appendix ("App.") 1.  AR 27.

In preparation for step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[5] through the date last insured to:

perform light work as defined in 20 CFR 404.1567(b) except: She could lift and/or carry up to twenty pounds occasionally and ten pounds frequently.  She could sit for up to five hours, and stand and/or walk for up to five hours each in an eight-

---

[4]    Although not pertinent to our discussion today, the ALJ appropriately consulted the four areas of mental functioning set out in the Listing of Impairments for evaluating mental disorders before finding Plaintiff's unspecified depressive disorder "did not cause more than minimal limitation of the claimant's ability to perform basic mental work activities and was therefore nonsevere."  AR 26; *see also* 20 C.F.R., Part 404, Subpt. P, App. 1.

[5]    "Residual functional capacity" is defined as "the most you can still do despite your limitations."  20 C.F.R. § 416.945(a)(1).

hour workday.  She could use both hands for simple grasping and repetitive motion. She could use both feet to operate foot controls.  She could frequently climb, balance, stoop, kneel, and reach above shoulder level.  She could occasionally crouch, and never crawl.  Exposure to unprotected heights was precluded.

*Id.*

At step four, the ALJ determined that "[t]hrough the date last insured, the claimant was unable to perform any past relevant work."  AR 32.  In making this finding, the ALJ considered the testimony of the vocational expert, who testified that:

given the above residual functional capacity, an individual with the same age, education, and work experience as the claimant could not return to the claimant's prior work as a:

Retail sales clerk (DOT 279.357-054), light work, semiskilled with an SVP of 3;

Cashier II (DOT 211.462-010), light work, unskilled with an SVP of 2; and,

Stock clerk (DOT 299.367-014), heavy work, semiskilled with an SVP of 4.[6]

*Id.*  The ALJ confirmed that the vocational expert's testimony was consistent with the information contained in the DOT.

In preparation for step five, the ALJ noted that Plaintiff was "born on April 2, 1980 and was 35 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563)."  *Id.*  The ALJ noted that Plaintiff "has at least a high school education and is able to communicate in English."  AR 33.  The ALJ then added that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills.  (See SSR [Social Security Ruling] 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)."  *Id.*

At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a))."  *Id.*  Specifically, the ALJ found Plaintiff could perform the "sedentary [and unskilled] work" of: "[o]rder clerk," DOT 209.567-014; "[c]harge account clerk," DOT 205.367-014"; and, "[c]all out

---

[6]   DOT is an abbreviation for *Dictionary of Occupational Titles* (U.S. Department of Labor, 1991).

operator, DOT 237.367-014."  *Id.*  The ALJ based his decision on the testimony of the vocational

expert at the administrative hearing and, further, determined that the vocational expert's testimony

was consistent with the information contained in the DOT.  AR 34.

The ALJ concluded that "the claimant was not under a disability, as defined in the Social

Security Act, at any time from December 31, 2009, the alleged onset date, through September 30,

2015, the date last insured (20 CFR 404.1520(g))."[7]  *Id.*

**C.    Summary of Medical Evidence**

**1.    Radiological Findings and Examinations**

On February 2, 2012, an x-ray of Plaintiff's lumbar spine taken at University of California,

Davis ("UC Davis") revealed "Grade 1 to two anterolisthesis of L5 on S1."  AR 489.

On March 12, 2012, Plaintiff told her doctor at UC Davis Health System she has:

> ongoing issues with her right elbow and arm pain.  She report[ed that] over the past
> several months she's been having ongoing pain over the lateral epicondyla of her
> right arm.  The pain emanates from the lateral epicondyle and radiates distally on
> the lateral aspect of the arm.  The pain is exacerbated by any gripping or twisting
> action.  She denie[d] any trauma to the region and reports no repetitive actions that
> she has been engaged in recently.  She's had previous difficulties with tendinitis in
> her arm and she was seen by occupational medicine . . . in the past for carpal tunnel
> as well as other tendinopathy.  She denie[d] any weakness, numbness, or history of
> trauma to that region.  She wishe[d] to have an evaluation by orthopedics or
> neurology for the problem. . . .
>
> She also notes she has pain in her low[er] back which radiates down into her left
> leg.  This was also previously evaluated down south by another provider. . . .
>
> Patient reports long history of on and off migraine symptoms for which [s]he was
> treated with Topamax.  She was unable to tolerate this medication due to the side
> effects of fatigue and dizziness.  She . . . has not followed up with a neurologist.
> She wishes to be seen again by neurology in order to determine if any other options
> are available [to] decrease the frequency of migraine attacks.  Currently she reports
> one to 2 attacks per week.

AR 575.

---

[7]    The ALJ's reference to "December 31, 2009, the alleged onset date," appears to be a clerical error.  AR 34.  As
the ALJ himself noted in his findings, Plaintiff amended her alleged onset date of disability to February 2, 2012.  AR
21, 24.  Evidence from outside the relevant period is of limited relevance.  *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d
1155, 1165 (9th Cir. 2008).  Accordingly, for purposes of this Report and Recommendation, the Court only discusses
evidence submitted from Plaintiff's amended alleged onset date of disability, February 2, 2012, through her date last
insured, September 30, 2015.

Treatment notes from UC Davis Health System on April 26, 2012 show Plaintiff achieved "[e]xcellent pain relief . . .with TENS, physical therapy, [and] exercise," and "[n]o pain relief . . . achieved with exercise, heat treatment, [and] ice pack[s]." AR 497. Around this time, Plaintiff declined to receive epidural injections and "proceed[ed] with physical therapy instead." AR 500.

On May 15, 2012, a physician from UC Davis Health System noted Plaintiff's symptoms are "diminished by NSAID[]s." AR 563. Also on May 15, 2012, a MRI taken of Plaintiff's lumbar spine at UC Davis Health's Department of Anesthesiology & Pain Medicine showed "grade 1 spondylolisthesis with right-sided spondylosis and possible left-sided spondylolysis at L5/S1; associated narrowing of the bilateral neural foramen with compression of the left L5 nerve roots and possible compression of the right L5 nerve roots." AR 486. At the same visit, Plaintiff complained of "right hip pain." AR 563.

On July 19, 2012, a physical examination of Plaintiff at UC Davis Health System revealed, among others:

- "Symmetric muscle bulk, without focal atrophy or bony abnormalities";

- "R[ight] shoulder slightly lower than left, otherwise w/ symmetric posture/alignment, no overt scoliosis, symmetric leg-length";

- "[F]ull flexion, extension, oblique extension, lateral bending, lateral shift without reproduction of pain" in the lumbar spine;

- Plaintiff's neck, bilateral upper extremities, and bilateral lower extremities were "nontender to palpation," but her back/vertebrae was "tender over bilateral SI joints left greater than right[]";

- "5/5 B[ilateral ]L[ower ]E[xtremities] H[ip ]F[lexors], K[nee ]F[lexors], K[nee ]E[xtensors], A[nkle ]D[orsiflexors], E[xtensor ]H[allucis ]L[ongus], A[nkle ]P[lantarflexors]";

- "[I]ntact" sensation to "L[ight ]T[ouch]/P[in ]P[rick] throughout L2-S2 bilaterally";

- "Positive faber on the right [sacroiliac joint] causing left SI pain. Negative faber on the left [sacroiliac joint]";

- "Positive yeomans [test] on the left [sacroiliac joint]. Negative on the right [sacroiliac joint]"; and,

- "[N]ormal gait."

AR 558.  The attending physician observed that Plaintiff's "complaint of pain radiating down the back of her leg to her foot along with the MRI is consistent with a radicular pain.  She also has significant lumbosacral facet arthritis as well as pain mostly in her left SI joint.  It seems the pain in her SI joint and back is most problematic for her."  AR 558–59.  The physician referred Plaintiff out to a pain specialist for steroid injections, and advised that she "continue with home exercise program as well as stretching."  AR 559.

Treatment notes from UC Davis Health System on October 18, 2012 indicate:

- Plaintiff's physical therapy sessions were "ineffective," except one therapy group which was "very good";

- Plaintiff stopped taking Gabapentin "due to side effects";

- Ibuprofen was "ineffective";

- Plaintiff experienced "mild relief" from "[c]old/warm compresses";

- "TENS 'works great," but Plaintiff did not own a TENS unit herself; and,

- Plaintiff experienced "mild relief" from icy-hot patches.

AR 552.  The next day, an x-ray of Plaintiff's lumbar spine revealed "grade 1 anterolisthesis of L5-S1" and degenerative changes in her spine.  AR 603.

On November 19, 2012, a physical examination at UC Davis Health System revealed "no deficit" in Plaintiff's fine motor skills, sensory assessment, and reflexes.  AR 539.  Plaintiff also had "no joint deformity or swelling."  *Id.*

On February 19, 2013, treatment notes from UC Davis Health System show Plaintiff was "not taking opioid medications."  AR 523.  "During the past month, she was . . . able to walk 4 blocks," "sit for 30 minutes . . . [,] and stand for 1 hour[] before pain became the limiting factor."  AR 524.  A physical examination of Plaintiff taken at this visit revealed no antalgic gait, and Plaintiff was "able to heel walk and . . . toe walk."  AR 527.  Plaintiff's bulk and tone of her lower limb were "normal," and she did not have any abnormal movements.  AR 528.  Plaintiff demonstrated 5/5 strength in all muscle groups tested in her lower limbs.  *Id.*  A sensory assessment revealed Plaintiff's "bilateral lower extremities are intact and symmetrical light touch.  There [was] no allodynia in the bilateral lower extremity."  *Id.*  Plaintiff's "range of motion [was] mildly restricted with flexion [and

extension] and is associated with no change in pain." *Id.* A Supine Straight Leg Raise test was "negative bilaterally"; a Gaenslen's Test caused "low back pain" on Plaintiff's left side; and, a Myofascial examination revealed "tenderness in the right gluteal muscle regions." *Id.*

On February 28, 2013, a physical examination conducted by UC Davis Health System revealed Plaintiff "appear[ed] well," had "normal" affect, and was "alert and oriented." AR 516. The examination also showed Plaintiff had full range of motion in her lumbar spine, "normal gait [and] supination," "intact" sensation, and "5/5" neurological strength. *Id.*

On September 11, 2013, a physical examination performed by UC Davis Health System showed Plaintiff had "intact and regular" peripheral cardiovascular pulses, "normal gait," and "5/5 [neurological] strength, [with] intact sensation to [light touch]." AR 809. The attending physician diagnosed Plaintiff with "lumbar disc degeneration, facet arthopathy, spondylolisthesis with significant improvement in radicular pain after [epidural steroid injections], presenting with more facet/[]buttock pain than radicular pain at this time." AR 810. The physician recommended Plaintiff "[f]ollow up with pain clinic as scheduled [and r]eturn to [physical therapy]." *Id.*

At a November 13, 2013 visit at UC Davis Health System, Plaintiff:

> Report[ed] continued problems with back pain radiating into her lower extremities. She's been using amitriptyline every night to help improve her sleep and decrease her chronic pain issues. She notes . . . the medication has been fair in its ability to regulate her pain level during the night and she is sleeping better on the agent. She needs a refill of amitriptyline. She has tried gabapentin for several months and reported no specific improvement in her level of pain but the medication also did help her sleep better than when she was off of it.
>
> Patient also has ongoing issues with elbow pain resulting in lateral epicondylitis. She was recently seen by sports medicine and there is a pending MRI on her elbow to evaluate the tendinous structures to determine if surgical intervention may be warranted. Patient had a planned follow up visit with orthopedics in approximately 2 or 3 weeks. She has ongoing pain issues with pain level at 6/10 intensity. Her pain is exacerbated by any flexion or extension of her wrist area.
>
> She also has chronic issues with migraine headaches. She takes amitriptyline and uses Imitrex to treat her acute symptoms. She notes the headache frequency is diminished and her headache severity is also improved.

AR 804. At this same visit, Plaintiff told a doctor with UC Davis Health System's Spine Clinic that she "walks 1 mile per day for exercise." AR 634.

On January 22, 2014, a physical examination provided by Mercy Medical Group noted Plaintiff had: "grossly intact" II-XII cranial nerves; "5/5" motor strength in all areas; "[n]o tenderness to palpation"; "no significant muscle spasm"; "no significant facet loading pain"; "[a]ctive extension [nor flexion] of the low back [did] not reproduce pain"; "[s]traight leg raise [was] positive at 45 degrees on [the] right [side]"; "[s]acroiliac [j]oint [and greater trochanter were] not tender to palpation"; "negative" Faber Test; and, "normal" gait. AR 615. The attending physician assessed Plaintiff with "chronic low back pain and right lower extremity pain," but noted the physical examination revealed "no significant weakness." *Id*. The physician observed that "[p]revious [epidural steroid injections] did provide 2-3 months of greater than 50% pain relief," and "[c]onservative measures to date include physical therapy[ and ]massage,[ which] have provided moderate relief, but pain still not well-controlled." *Id*.

On May 4, 2015, an x-ray of Plaintiff's pelvis and hips taken at Inland Imaging Valley Center revealed "[n]o fracture or dislocation. No significant arthropathy or soft tissue abnormalities. Normal bone mineralization." AR 1007. An x-ray of Plaintiff's lumbar spine taken on the same day showed "10 mm grade 1 anterolisthesis of L5 over S1. No abnormal motion between flexion and extension. Moderate loss of disc height at L5/S1. [Normal v]ertebral body heights." AR 1008.

Following Plaintiff's June 2, 2015 visit to Providence Health and Services, Dr. Erica Burns, an orthopedic surgeon, noted Plaintiff: appeared "[w]ell-nourished, well-developed, [had] no acute distress, [and was] awake and alert"; had a "[n]on-antalgic [gait], within normal limits, [without use of] assistive devices"; showcased "appropriate" mood and affect, without anxiety; had "no gross neurologic[al] deficits, [and] sensation intact to light touch"; and, demonstrated "[r]egular, unlabored breathing, [with] no apparent respiratory distress[.]" AR 995. Further, Dr. Burns opined that she:

> do[es]n't appreciate any swelling on inspection of [Plaintiff's] bilateral hands, wrists, elbows, forearms. There is no tenderness to palpation over the medial or lateral epicondyles. There is no increased pain with resistance against wrist extension. She has 2+ radial pulses. She has a negative Tinel sign bilaterally over the ulnar nerve. She has active wrist flexion and extension, and finger 80 adduction and abduction is within normal limits for strength. There is no effusion or swelling present in bilateral elbows. There is no instability. Range of motion is full and symmetric from 0-130° bilaterally. She has [] well-healed carpal tunnel incisions in bilateral volar wrists. There is no thenar, nor hyperthenar atrophy present.

*Id.*  Later that day, Dr. Burns supplemented her findings by assessing Plaintiff with "[b]ilateral chronic pain in forearms, wrists, and elbows, etiology uncertain." AR 1000. Dr. Burns prepared a plan of care for Plaintiff:

> I explained to the patient that [she does] not see any surgical indications given her symptoms, physical exam findings, and x-rays obtained today. I told her I plan to obtain her previous records from California, as well as her nerve conduction studies to determine if there is any compression of the ulnar nerve. However, based on her exam today I don't suspect there will be. Regardless, if her EMG [electromyography] studies do reveal a compression neuropathy of the ulnar nerve, I would prefer to obtain a new EMG to be certain that there is still compression prior to recommending any surgical intervention, because it currently does not fit with her physical exam findings or subjective complaints. I therefore explained to the patient, that I don't have any surgical recommendations at this point in time that would alleviate her symptoms of constant diffuse pain in her bilateral forearms, or the swelling that she gets with activity bilaterally. I advised her to modify her activity as necessary, and to avoid placing any undue pressure on the elbows. I will be in contact with the patient after we obtain the records from California, and to determine if a new EMG is indicated, but I do not think that I have any surgical intervention to offer the patient that would help with her symptoms, and management is likely to be conservative and symptomatic.

*Id.*

On June 12 and August 10, 2015 visits to SpineTeam Spokane, Plaintiff reported some pain relief ("about 30% in intensity [and] frequency") from her piriformis injections. AR 1188; *see also* AR 1192.

On August 27, 2015, a MRI of Plaintiff's lumbar spine at Inland Imaging at Holy Family Hospital showed that the "L5-S1 is moderately narrowed and dehydrated with a grade 1 anterolisthesis of L4 on L5[, u]ncover[ed] . . . disc and a diffuse disc bulge . . . [, m]oderate . . . to severe bilateral hypertrophic facet osteroarthrosis[, s]evere bilateral neural foraminal stenosis, . . . [c]ompression of the left L5 nerve root[,] L5-S1 diffuse disc bulge[, m]ld neural foraminal stenosis on the right [side of the L5-S1 disc, and m]ild to moderate canal stenosis." AR 1011.

On September 11, 2015, an EMG of Plaintiff's lumbar spine taken at the SpineTeam Spokane "showed acute right L5 and/or S1 radiculopathy." AR 1002. The physicians at this clinic noted that Plaintiff:

> has failed treatment with physical therapy, NSAIDs, epidural steroid injections, and piriformis injections. She describes her pain as sharp, radiating, burning, and dull across the lumbar spine. Pain is 5-6/10. Provocative factors include movement, standing, sitting/driving, and lifting. She reports achy muscles, low back spasms,

headaches, breathing problems, and insomnia. Patient['s] typical daily activities include stretching, sitting, and lying down. She sleeps 3-4 hours at night, with broken sleep.

*Id.*

### 2.    Medical Opinions

On March 12, 2012, Dr. Mark Montgomery, a hand surgeon, completed a check-box form requested by MetLife Insurance Company. AR 472–75. Dr. Montgomery checked boxes indicating:

- Plaintiff "is able to function under stress and engage in interpersonal relations" with "no limitations";

- Plaintiff can "[s]it," "[s]tand," and "[w]alk" for eight hours "[c]ontinuously";

- Plaintiff can "[t]wist/bend/stoop," "[r]each above shoulder level," and "[o]perate a motor vehicle," but cannot "[c]limb";

- Plaintiff can never lift/carry more than 11 lbs, but can "[o]ccasionally" lift/carry "[u]p to 10 lbs"[8];

- Plaintiff cannot perform repetitive "[f]ine finger movements" or "[p]ushing/pulling" with either hand, but can perform "[e]ye/hand movements" with both hands;

- "Occupational [t]herapy" and "[v]ocational [r]ehabilitation" were recommended; and,

- Plaintiff was advised not to return to work.

AR 473. Dr. Montgomery also handwrote a portion of his responses on the check-box form. Dr. Montgomery noted that Plaintiff had CTS surgery on her right hand on September 14, 2010, and on her left hand on November 30, 2010. AR 472. Dr. Montgomery opined that Plaintiff is unable to perform job duties because of "[p]ain & weakness in [her] hands," but also wrote that Plaintiff "can work a total of 8 hours per day." AR 473. Dr. Montgomery did not expect improvement in any area. *Id.* Dr. Montgomery diagnosed Plaintiff with "sprains & strains of elbow/forearm" and CTS. AR 472.

State agency consulting physicians submitted opinion evidence on July 9 and September 4, 2014, as well as on January 2 and March 19, 2015. AR 79–102, 104–11, 114–27. All of the state agency consultants opined that Plaintiff could "[o]ccasionally" lift and/or carry 20 pounds; "[f]requently" lift and/or carry 10 pounds; "[s]tand and/or walk (with normal breaks) for a total of .

---

[8]    "Occasionally" in this section is defined as "1-35%" of the time. AR 473.

. . [a]bout 6 hours in an 8-hour workday"; "[s]it (with normal breaks) for a total of . . . [a]bout 6 hours in an 8-hour workday"; and, "[p]ush and/or pull (including operation of hand and/or foot controls)" with no limitations.[9]  AR 86, 98.  The consulting physicians also opined that Plaintiff could frequently "[c]limb[ r]amps/stairs"; frequently "[s]toop[] (i.e., bending at the waist)"; frequently "[k]neel[]; frequently "[c]rouch[] (i.e., bending at the knees)"; and, occasionally "[c]rawl."  AR 86-87, 98-99, 123.  The consultants stated that Plaintiff suffered from "manipulative limitations," including: "[l]imited" reaching in the "[r]ight [o]verhead" direction, limited "[h]andling (gross manipulation)" in both hands, and, limited "[f]ingering (fine manipulation)" in both hands.  AR 87, 99, 123–124.  The state agency consultants initially concluded that Plaintiff was "[n]ot [d]isabled."  AR 101, 126.  One consultant opined Plaintiff retained RFC to perform past relevant work of the "[s]ales [c]lerk" occupation, DOT 290.477-014, as "[g]enerally [p]erformed in the [n]ational [e]conomy."  AR 101.  Another consultant concluded that the highest skill level of Plaintiff's past relevant work was "semi-skilled," Plaintiff is not limited to unskilled work because of her impairments, Plaintiff "demonstrates the maximum sustained work capability" for "light" work, and Plaintiff could work as a "[b]akery [w]orker [on the c]onveyor [l]ine," "[c]otton [c]lasser [a]ide," or "[f]ruit [d]isributor."  AR 126.  The consultant performing Plaintiff's Psychiatric Review Technique Report assessments stated that Plaintiff:

> had a past medical history of depression and . . . fatigue and trouble sleeping.  She had normal concentration and attention. . . . [an August 22, 2014 Function Report stated] claimant gets up 10 a.m.–11 a.m. and brushes teeth and hair.  She gets breakfast, watches t.v., takes dogs to the dog park, and talks to her husband on the phone.  She has dinner between 6 p.m. and 7 p.m.  She feeds the dogs and watches t.v. in the evening.  She showers and puts on pajamas and goes to bed at 10:00-10:30 p.m.  She sets alarms to take medications.  She can prepare simple meals.  Claimant can drive; she goes short distances due to difficulty sitting.  She can shop but has difficulty.  She can pay bills.  She reports short-term memo[r]y loss/concentration problems.  Stress triggers migraines.

> Claimant's limitations appear physical in nature.  Her depression appears non-severe.

AR 97, 121.  The state agency consultants noted that their observations were supported by Plaintiff's past diagnoses of "[l]ow back pain, [l]umbar [degenerative disc disease], facet arthopathy,

---

[9]    "Occasionally" in this section is defined as "cumulatively 1/3 or less of an 8 hour day), and "frequently" is defined as "cumulatively more than 1/3 up to 2/3 of an 8 hour day).  AR 86, 98.

spondylosis, [a]sthma -mild intermittent, lateral epicondylitis, forearm pain[, and carpal tunnel syndrome]."  AR 86–87, 98–99.  However, as the ALJ notes in his findings, these consultants did "not have an opportunity to review additional evidence submitted at the hearing level . . . , which support greater exertional impairment, and less non-exertional impairment regarding the claimant's upper extremities . . . ."  AR 30, *citing* AR 791–1650.  On reconsideration, the state agency psychological examiner, Cynthia Collingwood, "partially adopted" consultative examiner Samantha Chandler's opinion (discussed below), and discounted it to the extent it rendered a psychological prognosis.  AR 122; *see also* AR 785–90.

On February 3, 2015, Dr. Samantha Chandler, a Clinical Psychologist, performed a Psychological Diagnostic Evaluation of Plaintiff.  AR 785–90.  At this evaluation, Plaintiff:

> reported being depressed and anxious for the past five years.  On a scale from 1 to 10, she said her depression and anxiety are usually at a 4.  She conveyed feeling sad, having trouble sleeping, a fluctuating appetite, and becoming easily irritable.  She stated, "I get frustrated because I can't physically do the things I used to do.  I'm anxious about being alone in case I can't do things and need help.  Since moving to Spokane, I get anxious about being in the car with the snow and ice."  She reported her inability to work and emotional symptoms are due to her physical problems. . . .
>
> She related physical complaints of a pinched sciatica, bulging disks, b/l tennis elbow, b/l CTS, migraines, and pain in her right hip and down both legs.  She denied taking her Sumatriptan . . . or Amitriptyline . . . prior to this appointment.  She then commented that she takes the Amitriptyline for migraines and depression. . . .
>
> She reported being unable to lift more than ten pounds; walk for more than three to four blocks; stand for more than forty-five to sixty minutes; sit for more than sixty minutes; and sometimes has difficulty bending, kneeling, squatting, and reaching down.  She said she uses a brace on each wrist as needed and a tens unit when her pain is really bad. . . .
>
> She estimated she began taking medication for her depression three or four years ago but denied being able to remember the names of any previous medications before taking Amitriptyline.  She denied ever receiving inpatient psychiatric treatment or outpatient mental health services. . . .
>
> Her gait appeared somewhat slow.  Pain behaviors were observed during the session in that she would often shift position in her chair sitting forward or leaning to one side or the other and when standing after forty-five minutes her movements appeared slow and stiff . . . No atypical motor movements were observed.  No psychomotor agitation or retardation was observed.  Her persistence and pace were within normal limits.  She presented as attentive and goal-directed during the session.  She was able to follow conversation in that her responses were topic-related and she did not request that any information be repeated or further clarified.  Her articulation, rate, and volume of speech were normal.  She expressed her ideas appropriately and her thinking was organized and coherent.  She was cooperative

14

and her eye contact was appropriate.  She presented with a somewhat restricted affect and depressed mood.  No symptoms of anxiety were observed during the session. Her mood and affect were congruent.  No evidence of a formal thought or perceptual disturbance was observed or reported.  She denied any suicidal or malevolent thoughts or ever attempting suicide. . . .

She said she lives with her husband and son.  She described the following average daily routine: She said she wakes up around eleven o'clock in the morning, goes to the bathroom, gets a drink of water, lets the dogs out, and smokes a cigarette.  She denied eating breakfast or lunch.  On a given day, she watches television and sometimes does chores but spends most of her day lying down off and on because of pain.  She said her husband/son usually fix[es] dinner but she will fix it a couple of times a week . . . .  In the evenings, she spends time with her family sometimes watching television.  When asked about her sleep pattern, she stated, "Seventy-five percent of the time I'm unable to fall asleep before three o'clock in the morning.  I sleep until ten or eleven the next morning but my sleep is not restful because I am tossing and turning all night due to pain." . . .

She conveyed showering, putting on clean pajamas, combing her hair, and brushing her teeth daily.  In regard to chores, she said her son usually does the vacuuming but sometimes she does it once a month as well as doing dishes daily by hand and laundry once a week with her husband or son carrying the laundry up and down the stairs.  She conveyed that her son does steam mopping and her husband sweeps and cleans the bathroom due to her physical problems.  She related riding with her husband to the grocery store once a month where he pushes the cart and they split their grocery list to get the items they need and then one of them pays for them.  She said she feeds and waters their three dogs.  She denied needing any reminders to do daily tasks or doing any outdoor activities or chores.  She conveyed being able to leave the house alone and knows how to drive a car but only drives on the base depending on the weather; otherwise, she gets a ride with her husband.  She conveyed having difficulty finishing [sic] finishing activities in a timely manner due to her physical problems.  She described her hobbies/interests as watching television, reading, and playing games on her iPad for about ten minutes at a time.  She conveyed changes in her daily activities as a result of her physical problems include working, being able to do chores the way she used to, and pursuing activities she used to enjoy such as taking long walks, bowling, and baking.  She denied attending any groups on a regular basis.  She said she watches television two to three hours a day and spends a total of an hour on her iPad.  She reported talking to her parents in Japan three or four times a week and her brother and sister in Las Vegas once a week.  She related having two friends in California she talks to every day.  She denied making any new friends since moving to the Spokane area in November 2014.

AR 785–88.  Dr. Chandler diagnosed Plaintiff with an "[u]nspecified [d]epressive [d]isorder with anxious distress."  AR 789.

On June 2, 2015, Dr. Burns performed an evaluation of Plaintiff.  AR 1000–01.  Dr. Burns explained that obtaining a new EMG may be preferable because "surgical intervention [for compression neuropathy of the ulnar nerve] . . . currently does not fit with [Plaintiff's] physical exam findings or subjective complaints."  AR 1000.  Dr. Burns therefore opined that she did not "have any surgical recommendations at this point in time that would alleviate her symptoms of constant diffuse

15

pain in her bilateral forearms, or the swelling that she gets with activity bilaterally.  [Dr. Burns] advised [Plaintiff] to modify her activity as necessary, and to avoid placing any undue pressure on the elbows." *Id*.  Dr. Burns diagnosed Plaintiff with "[b]ilateral chronic pain in forearms, wrists, and elbows, etiology uncertain." *Id*.

On September 11, 2015, Greg Wilkinson completed a work release form requested by MetLife insurance company. AR 1180–1184.  Out of an eight-hour work day, Wilkinson opined Plaintiff can "[s]it" for one hour with intermittent one hour breaks; "[s]tand" for eight hours with intermittent breaks every 30 minutes; "[w]alk" for three hours with intermittent breaks every 30 minutes; "[p]erform fine finger movements" for eight hours continuously; and, "[p]erform eye/hand movements" for eight hours continuously.  AR 1182.  Wilkinson indicated Plaintiff cannot "[c]limb," "[t]wist/[b]end/[s]toop," "[r]each above shoulder level," or "[r]each front and side at desk level" at all.  *Id*.  Wilkinson noted Plaintiff could "lift or carry" or "push or pull" "[u]p to 10 lbs" for less than one hour in an eight-hour workday, with intermittent breaks every "2-3 min[utes]." *Id*. Wilkinson checked boxes indicating Plaintiff could operate a motor vehicle, and was not "at maximum medical improvement." *Id*.  Wilkinson concluded that Plaintiff is "[n]ot able to return to work" because she "[r]equire[s] surgical decompression." AR 1183.

## D.   **Plaintiff's Symptom Testimony**

On examination by ALJ John Cusker during the September 28, 2016 administrative hearing, Plaintiff testified that she was born on April 2, 1980 and was 36 years old.  AR 49.  Plaintiff has a driver's license and is able to drive.  AR 50.  Plaintiff did not graduate from high school, but she does have a GED. *Id*.  Plaintiff last worked as a "[s]ales associate" at the Port Hueneme Navy Exchange. *Id*.  Plaintiff has also worked as a "[s]ales associate, laborer, [and] stocker" in the past. *Id*.

Plaintiff has not worked since February 2, 2012, her amended onset date of disability.  AR 50–51.  Plaintiff testified that her "back, the pain[,]the medication that [she is] on . . . [, her] hands[,] and [her] migraines" limit her ability to work.  AR 51.  Plaintiff received surgery on both of her hands six years ago. *Id*.  Plaintiff "was supposed to . . . get surgery when [she] was in Sacramento back in 2012 [or 20]13 . . . [f]or [her] elbow." AR 56.  Several doctors recommended that Plaintiff

receive surgery again for her hands.[10]  AR 51–52.  Plaintiff was being treated by "physician assistant Mia" for her hands; the Kozmary Pain Relief Center for pain management; and, "Dr. Forage" of the Brain and Spine Institute for her back.  AR 53–54.

Plaintiff was involved in a motor vehicle accident in July 2016, for which she has been seeing Dr. Louder from the Mike O'Callaghan Military Medical Center to treat her pain.  AR 57.  Plaintiff anticipated she would be receiving medication, in addition to the "Lyrica, methocarbamol with a narcotic[, and] other medications for [her] migraine" she is already taking.  AR 57–58.  Plaintiff's medications only relieve her symptoms when she is asleep.  AR 58.  Plaintiff is not receiving any mental health treatment.  AR 59.

Plaintiff lives with her spouse, son, brother, and sister.  AR 59–60.  Plaintiff dresses and bathes herself without assistance.  AR 60.  Plaintiff "[s]ometimes" prepares meals and goes shopping.  *Id*.  Plaintiff "[s]ometimes" does household chores, although she clarified that she just does the laundry and "can't vacuum because it hurts [her] back and [her] hands, . . . can't mop, . . . can't sweep, . . . [and] can't wash dishes because [she] break[s] dishes all the time."  *Id*.  Plaintiff used to bowl, although she no longer does so.  *Id*.  Plaintiff does not attend religious services or belong to any social organization.  AR 61.  Plaintiff sleeps around 19 to 20 hours a day, and watches television when she is awake.  *Id*.  When she is able to do so, Plaintiff "walk[s] around the house" and "stretches."  *Id*.  Plaintiff takes her dogs out to the park every day with her husband "[n]o more than 15, 20 minutes at a time," but remains seated at the park.  AR 61–62.

Plaintiff can walk "two blocks" before having to stop, and can stand "30 minutes to an hour at . . . most" before changing positions.  AR 62.  Because of her medical problems, Plaintiff "[d]rop[s] things, [and experiences] weakness, numbing, [and] sharp pains in [her] whole arm and [her] wrist.  [Plaintiff also has a] ganglion cyst . . . [o]n [her] ring finger" of her right hand, which is aggravated whenever she grabs something.  AR 63.  The heaviest thing Plaintiff can lift is "a gallon of milk but with both hands."  *Id*.  Plaintiff is able to sit for two hours at a time, although this is "[p]ushing it . . . [, and she is] always having to shift" positions.  *Id*.

---

[10]    The ALJ granted Plaintiff's representative Noel Anschutz an extension of time through October 18, 2016 to produce these doctors' reports, as they were not in the record at the time of the administrative hearing.  AR 47.

On examination by her representative, Plaintiff testified that she goes grocery shopping "twice a month" for "[t]wenty minutes at the most[,] . . . only for light shopping[.]"  AR 63–64. Plaintiff has been sleeping 19 to 20 hours for the past "couple months since [the doctors] changed [her] medication."  AR 64.  Plaintiff's doctors told her that sleeping excessively "is the side effect [of her new medication] and [she] could choose whether to take it or not take it, so [Plaintiff] can be in pain all day or [she] can sleep all day, either/or."  *Id.*  Prior to changing her medication, Plaintiff was sleeping "[t]wo to three hours" during the day and "wasn't sleeping at night [because she] was tossing and turning in pain."  *Id.*  Whenever she was awake during this period of her life, Plaintiff would "[t]ry[] to get comfortable [because she could not:] sit still for long periods of time, . . . stand still for long periods of time, . . . [or] lay down for long periods of time."  AR 65.  Plaintiff currently experiences "migraines at least twice a week and[, if she is] on [her menstrual] cycle[, Plaintiff] can get . . . a migraine for a week and a half."  *Id.*  When Plaintiff has a migraine, she has "to cut off all the lights, [makes sure] there's no noises [and it is] pitch black, and tr[ies] to sleep[.]"  *Id.*  In addition, Plaintiff experiences nausea, "depression," and experiences "swelling" and "pressure in the back of [her] eye."  *Id.*  Plaintiff has seen a neurologist, had physical therapy "[f]or [her] hands and . . . back," and received ineffective epidural injections.  AR 65–66.

**E.    Vocational Expert ("VE") Testimony**

VE Heidi Paul testified at Plaintiff's administrative hearing that Plaintiff's past relevant work as a "retail salesclerk," DOT number 279.357-054, physical demand at the "light" level, SVP skill level 3, was a semiskilled job.  AR 68.  The next position Plaintiff worked as, "[c]ashier II," DOT number 211.462-010, physical demand at the "light" level, SVP skill level 2, was an unskilled job. *Id.*  Plaintiff also worked as a "[c]ook, short-order," DOT number 313.374-014, physical demand at the "light" level, SVP skill level 3.  *Id.*  Plaintiff also previously worked as a "stock clerk," DOT number 299.367-014, physical demand at the "heavy" level, SVP skill level 4.[11]  *Id.*  ALJ Cusker posed two hypotheticals to VE Paul, the first "based on the state agency medical consultant's opinion."  *Id.*  The ALJ asked the VE to assume a hypothetical individual "with the same age, education and previous work experience as the claimant," who:

---

[11]    The VE did not testify as to the skill level required by the short-order cook and stock clerk positions.  AR 68.

> can lift and/or carry 20 pounds occasionally and 10 pounds frequently[, . . .] stand and/or walk with normal breaks for about six hours in an eight-hour, workday, and sit with normal breaks for about six hours in an eight-hour workday. Pushing and/or pulling are unlimited except as indicated for lifting and/or carrying. This hypothetical person can frequently climb ramps and/or stairs, can occasionally climb ladders, ropes and/or scaffolds. Balance is unlimited, [and] she can frequently stoop, kneel, crouch and occasionally crawl. There are some manipulation limitations. This hypothetical person can reach overhead bilaterally only occasionally. On the other hand[,] handling and fingering, that is to say fine and gross manipulation[,] can be done frequently with both upper extremities. There are no other limitations. Could an individual with this residual functional capacity perform the claimant's past work either as actually or generally performed?

AR 68-69. VE Paul testified that the foregoing hypothetical person could perform Plaintiff's past relevant work as a "retail salesclerk, the cashier II[,] and the short-order cook" *Id.*

The ALJ's second hypothetical was based on a "medical source statement . . . [from] Dr. Greg Wilkinson[, . . .] a former treating source." AR 69–70. The ALJ asked VE Paul to assume a hypothetical individual who:

> can sit for about five hours in the course of an eight-hour day, [and] stand and/or walk for about five hours in the course of an eight-hour day. This individual is able to use both hands for simple grasping and can use both hands for repetitive motion tasks. This hypothetical person can use both feet to operate foot controls, this hypothetical person can occasionally lift as much as 20 pounds and frequently lift up to 10 pounds. This hypothetical person can never crawl, can occasionally crouch, can frequently climb, balance, stoop, kneel and reach above shoulder level. This hypothetical person can never be exposed to unprotected heights. . . . Could an individual with this residual functional capacity perform any of the claimant's past work?[12]

AR 70. VE Paul opined that this hypothetical individual would not be able to perform any of the claimant's past work. *Id.* However, this hypothetical individual could perform other jobs in the national economy, including the "order clerk" occupation, DOT number 209.567-014, physical demand at the "sedentary" level, SVP skill level 2; the "charge account clerk" occupation, DOT number 205.367-014, physical demand at the "sedentary" level, SVP skill level 2; and, the "call out operator" occupation, DOT number 237.367-014, physical demand at the "sedentary" level, SVP skill level 2. AR 70–71. VE Paul confirmed that there was no inconsistency between her testimony and the DOT because the DOT defines sedentary work as "sitting up to six hours in an eight-hour day." AR 71.

---

[12]   The ALJ noted that Wilkinson's April 4, 2016 medical source statement form, on which this second hypothetical was based, "precluded things the claimant actually does, specifically driving." AR 70.

On examination by Plaintiff's representative, VE Paul stated that a hypothetical individual would not be able to perform claimant's past work or any other work if the ALJ amended the "sitting and standing restrictions [of his first hypothetical] to be sitting four [sic] two hours in an eight-hour day[,] and the rest of the time this person would need to lay down or be in a reclined position [for] the other four hours[.]"  AR 71–72.  VE Paul also stated that a hypothetical individual would not be able to perform any work at any RFC level if "the person has less than occasional use bilaterally of their hands for fingering and handling[.]"  AR 72.  The VE further testified that a person would not be able to perform claimant's past work or any other work "if the person was going to be off task for 20% or more of the day."  *Id*.  Finally, VE Paul opined that an individual would not be able to perform Plaintiff's past work or any other work "if the person was going to miss two or more days per month of work[.]"  *Id*.

**F.    Issues Presented**

Plaintiff contends the ALJ erred by improperly:  (1) according "no weight" and "very little weight" to Plaintiff's treating physicians Dr. Mark Montgomery and Dr. Erica Burns' opinions, respectively (ECF No. 17 at 7:23–9:23); (2) finding Plaintiff not credible (*id*. at 9:24–12:19); and (3) formulating a step-five finding unsupported by substantial evidence (*id*. at 12:20–13:12).  The Court examines each of the ALJ's findings below.

**1.    Plaintiff's Treating Physicians' Opinions**

In accordance with Social Security regulations, courts have "developed standards that guide our analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008) (internal citation omitted).  Courts "distinguish among the opinions of three types of physicians:  (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  For claims filed before March 27, 2017, as is the case here, "the opinion of a treating physician is [given] greater weight than that of an examining physician, [and] the opinion of an

1    examining physician is entitled to greater weight than that of a nonexamining physician." *Garrison*

2    *v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (internal citation omitted); *see also* 20 C.F.R. §§

3    404.1527, 416.92.

4        "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, the

5    ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial

6    evidence." *Garrison*, 759 F.3d at 1012 (internal citation omitted). "This is so because, even when

7    contradicted, a treating or examining physician's opinion is still owed deference and will often be

8    'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.*,

9    *citing Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). To satisfy the "substantial evidence"

10   requirement of the specific and legitimate reasons standard, the ALJ should set forth a "detailed and

11   thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretations thereof,

12   and mak[e] findings." *Garrison*, 759 F.3d at 1012, *citing Reddick v. Chater*, 157 F.3d 715, 725 (9th

13   Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations

14   and explain why they, rather than the doctors' are correct." *Id.* (internal citation and quotation marks

15   omitted). The ALJ can never arbitrarily substitute his own opinion for the opinion of competent

16   medical professionals. *Tackett v. Apfel*, 180 F.3d, 1094, 1102 (9th Cir. 1999).

17       Here, the ALJ attributed no weight and very little weight to the opinion of Plaintiff's treating

18   physicians Dr. Mark Montgomery and Dr. Erica Burns, respectively, because: (a) Dr. Montgomery's

19   opinion "is inconsistent with medical findings[] and other medical source opinions" (AR 32), and

20

21

22

23

24

25

26

27

28

(b) Dr. Burns' opinion is "not supported by the clinical findings, which indicate normal physical examination and radiographic findings."[13] (AR 31). These findings are discussed below.

> a.  The ALJ properly afforded no weight to Dr. Montgomery's opinion, because it was inconsistent with medical findings.

A medical opinion may be rejected if it is unsupported by medical findings. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009); *Batson v. Comm'r of Soc. Sec. Admin*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). An ALJ may discredit physicians' opinions that are unsupported by the record as a whole. *Batson*, 359 F.3d at 1195. Moreover, an ALJ is not obliged to credit medical opinions that are unsupported by the medical source's own data and/or contradicted by the opinions of other examining medical sources. *Tommasetti*, 533 F.3d at 1041.

---

[13]    In lieu of Dr. Montgomery's and Dr. Burns' opinions, the ALJ was entitled to, and did, assign more weight to alternative, well-supported, and timely medical opinions from examiners made during the relevant adjudicatory period. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."). Specifically, the ALJ assigned "some" weight to the state agency consultants' opinions, which found "claimant could perform light work, with capacity for occasionally climbing ladders, ropes, and/or scaffolds, crawling, and overhead reaching with the right upper extremity; frequent climbing of ramps and/or stairs, stooping, kneeling, and crouching, and handling and fingering with both upper extremities." AR 30 (internal citations omitted). However, the ALJ declined to endorse limitations regarding Plaintiff's upper extremities by the state agency consultants, noting that they "did not have an opportunity to review additional evidence submitted at the hearing level . . . , which support greater exertional impairment, and less non-exertional impairment regarding the claimant's upper extremities . . . ." *Id.* (internal citations omitted).

    The ALJ assigned "some" weight to Dr. Chandler's February 3, 2015 Psychological Diagnostic Evaluation generally, and "no" weight specifically to the portion of the opinion discussing Plaintiff's psychological prognosis. AR 31. Dr. Chandler "reported that the claimant had a somewhat restricted affect, and depressed mood, and diagnosed an unspecified depressive disorder . . . . She opined the claimant had the cognitive ability to remember information, sustain concentration and attention for at least a reasonable amount of time, understand complex concepts, follow three-step instructions, learn new tasks, tolerate supervision, and carry out complex tasks." *Id.* (internal citations omitted).

    The ALJ assigned "[l]ess" weight to Greg Wilkinson's September 11, 2015 work release form, which opined "claimant could sit for one hour, stand for eight hours, and walk for three hours in an eight-hour workday with breaks. She could continuously perform fine finger and eye/hand movements. She could lift/carry up to ten pounds intermittently, for less than one hour. She could operate a motor vehicle. He opined the claimant was not able to return to work because she needed a surgical decompression, and he referred her to a specialist for a second opinion . . . ." *Id.* (internal citations omitted).

    The Court finds physician assistant Greg Wilkinson's April 4, 2016 medical source statement (to which the ALJ assigned an unspecified amount of weight) is of limited relevance because this opinion was from outside the relevant adjudicatory period. *Carmickle v. Comm'r Soc. Sec. Admin*, 533 F.3d 115, 1165 (9th Cir. 2008); *see also Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223–24 (9th Cir. 2010) (date of social worker's opinion rendered more than a year after the date last insured was a germane reason to not address the opinion).

On March 12, 2012, Dr. Montgomery checked boxes on a Attending Physician Statement form indicating:

- Plaintiff had "no limitations . . . function[ing] under stress and engag[ing] in interpersonal relations";

- Plaintiff could "continuously . . . [s]it," "[s]tand," and "[w]alk" for eight hours;

- Plaintiff could "[t]wist/bend/stoop," "[r]each above shoulder level," and "[o]perate a motor vehicle," but could not "[c]limb";

- Plaintiff could never lift/carry more than 11 lbs, but could "[o]ccasionally" lift/carry "[u]p to 10 lbs";

- Plaintiff could not perform repetitive "[f]ine finger movements" or "[p]ushing/pulling" with either hand, but could perform "[e]ye/hand movements" with both hands;

- "Occupational [t]herapy" and "[v]ocational [r]ehabilitation" were recommended; and,

- Plaintiff was advised not to return to work.

AR 473. Dr. Montgomery wrote that Plaintiff is unable to perform job duties because of "[p]ain & weakness in [her] hands," but also indicated that Plaintiff "can work a total of 8 hours per day." *Id*. Dr. Montgomery did not expect Plaintiff's symptoms to improve in any area. *Id*. Dr. Montgomery diagnosed Plaintiff with "sprains & strains of elbow/forearm" and CTS. AR 472.

As a preliminary matter, Plaintiff argues that "[t]he ALJ did not provide clear and convincing reasons to discount [Dr. Montgomery's] opinion." ECF No. 17 at 8:24–25. However, because Dr. Montgomery's opinion is contradicted by other physicians' opinions—including that of Plaintiff's other treating physician, Dr. Burns—the ALJ was required to only provide specific and legitimate reasons supported by substantial evidence to meet his evidentiary burden. *Garrison*, 759 F.3d at 1012 (internal citation omitted). The ALJ provided such reasoning here: Dr. Montgomery's opinion "is inconsistent with medical findings, and other medical source opinions."[14] AR 32; *see also*

---

[14]    Defendant alleges that the ALJ "noted[] Plaintiff was conservatively treated with Ibuprofen - which was inconsistent with Dr. Montgomery's contention that her impairment caused severe disabling condition with no improvement." ECF No. 25 at 7:1–3 (internal citations omitted). Defendant also points out that "the ALJ found . . . Plaintiff's CTS and elbow pain were non-severe." *Id*. at 6:9. However, a review of the record shows the ALJ did not specifically list Plaintiff's purported conservative treatment or the non-severe nature of Plaintiff's CTS and elbow pain as reasons to discount Dr. Montgomery's opinion. Well settled law holds that the district court may only affirm the ALJ's decision on grounds upon which he relied. 42 U.S.C. § 405(g); *Stout v. Comm'r Soc. Sec. Admin*, 454 F.3d 1050, 1054 (9th Cir. 2006). Accordingly, the Court may not affirm or reject the ALJ's determination based on Defendant's arguments. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

*Tommasetti*, 533 F.3d at 1041–42 (providing that a treating physician's opinion's inconsistency with medical records is a specific and legitimate reason for rejection).  Specifically, the ALJ found:

> The record shows no focal atrophy throughout the arm, full shoulder abduction, and intact sensation, negative Tinel's at the cubital tunnel, full range of motion of the right elbow with flexion and extension, intact sensation, pain with wrist extension and extension of the third PIP joint, mild discomfort with resisted wrist flexion, and full range of motion of her extremities with normal grip strength . . . .  Physical examination of her elbows showed tenderness to palpation along the lateral epicondyle and within the common extensor tendon.  However, she was able to fully flex and extend the elbows.  Her sensation was intact to light touch bilaterally in the upper extremities and she had five out of five strength testing in bilateral upper extremities . . . .  Examination of her upper extremities in 2015 showed no swelling on inspection of bilateral hands, wrists, elbows, or forearms.  There was no tenderness to palpation over the medial or lateral epicondyles.  There was no increased pain with resistance against wrist extension.  There was no effusion or swelling present in bilateral elbows.  There was no instability.  Range of motion was full and symmetric.  . . . An x-ray of her bilateral elbows on June 2, 2015, showed normal findings with no evidence of degenerative arthritis, fractures, or dislocations . . . .[15]

AR 32 (internal citations omitted).

On this record, the Court finds the ALJ more than sufficiently met the evidentiary burden needed to make a finding of inconsistency between Dr. Montgomery's opinion and the objective medical evidence.  Even if the contradictory clinical findings and medical opinions were to support another reasonable interpretation, the ALJ's finding of inconsistency between Dr. Montgomery's opinion and the medical record must be upheld.  *Batson*, 359 F.3d at 1198 (recognizing that when the evidence in the record is subject to more than one rational interpretation, the court defers to the ALJ's finding).

Notwithstanding, Plaintiff maintains that the ALJ's finding of inconsistency between Dr. Montgomery's opinion and the medical record constitutes reversible error because "the other providers the ALJ mentioned, Dr. Chandler and Wilkerson [sic], evaluated Plaintiff for her mental health issues and for her back pain and did not actually address Plaintiff's hands and wrists."  ECF No. 17 at 8:19–24.  Plaintiff also argues that Dr. Montgomery's opinion is consistent with "his own treatment records showing that while Plaintiff's carpal tunnel syndrome improved somewhat following her release surgeries in 2010, the pain, swelling, stiffness, and numbing gradually

---

[15]    All of the contradictory clinical findings and opinions referenced by the ALJ were provided during the relevant adjudicatory period.

returned," and with Dr. Burns' opinion, which stated that "Plaintiff had ongoing limitations in the repetitive use of her hands and arms." *Id.* at 8:15–17, 18–19 (internal citation omitted). The Court disagrees with each of Plaintiff's assertions.

First, the ALJ discounted Dr. Montgomery's opinion on the basis of its inconsistency with medical evidence from the UC Davis Health System and Dr. Burns' office treatment records. AR 32, *citing* AR 477, 502, 536, 629, 995. That is, the ALJ never made findings of inconsistency between Dr. Montgomery's opinion and Dr. Chandler's and Wilkinson's opinions. Plaintiff's allegations of error on these bases are therefore meritless. Further, Plaintiff cites to Dr. Montgomery's treatment records in support of her arguments, but none of these reports were prepared during the relevant adjudicatory period and, therefore, are of limited relevance.[16] AR 472–75; *see also Carmickle*, 533 F.3d at 1165. Finally, as discussed further below, Dr. Montgomery's opinion was not necessarily consistent with Dr. Burns' opinion, which explained that "surgical recommendations" or a finding of "compression neuropathy of the ulnar nerve" were premature at that point in time. AR 1000.

Based on the foregoing, the Court concludes the ALJ properly accorded no weight to Dr. Montgomery's opinion as inconsistent with clinical findings and other medical opinions.

b. The ALJ properly afforded little weight to Dr. Burns' opinion because it was not supported by the medical findings.

On June 2, 2015, Dr. Erica Burns, an orthopedic surgeon, assessed Plaintiff with "[b]ilateral chronic pain in forearms, wrists, and elbows[.]" AR 1000. At this visit, Dr. Burns prepared a plan of care for Plaintiff, stating:

> I explained to the patient that I do not see any surgical indications given her symptoms, physical exam findings, and x-rays obtained today. I told her I plan to obtain her previous records from California, as well as her nerve conduction studies to determine if there is any compression of the ulnar nerve. However, based on her exam today I don't suspect there will be. Regardless, if her EMG studies do reveal a compression neuropathy of the ulnar nerve, I would prefer to obtain a new EMG to be certain that there is still compression prior to recommending any surgical intervention because it currently does not fit with her physical exam findings or subjective complaints. I therefore explained to the patient, that I don't have any

---

[16]     Dr. Montgomery's treatment records are from November 15, 2010 (AR 460–61); May 26, 2011 (AR 466); June 7, 2011 (AR 462–65); August 11, 2011 (AR 467–469); August 23, 2011 (AR 470); and, December 16, 2011 (AR 471). All of these records fall outside the relevant adjudicatory period, which runs from Plaintiff's amended onset date of disability, February 2, 2012, through her date last insured, September 30, 2015. AR 21, 48.

1
2
3
4

> surgical recommendations at this point in time that would alleviate her symptoms of constant diffuse pain in her bilateral forearms, or the swelling that she gets with activity bilaterally. I advised her to modify her activity as necessary, and to avoid placing any undue pressure on the elbows. I will be in contact with the patient after we obtain the records from California, and to determine if a new EMG is indicated, but I do not think that I have any surgical intervention to offer the patient that would help with her symptoms, and management is likely to be conservative and symptomatic.

5

*Id*. ALJ Cusker accorded "very little weight to Dr Burns' opinion respecting modification of

6

activities, as it is not supported by the clinical findings, which indicate normal physical examination

7

and radiographic findings." AR 31 (internal citation omitted).

8

Plaintiff claims the ALJ erred by "failing properly to consider Dr. Burns' opinion that

9

Plaintiff should limit the use of her hands and arms" because Dr. Burns "opined Plaintiff needed a

10

new electrodiagnostic test to determine whether there was any compression neuropathy of her ulnar

11

nerve. . . . The previous EMG study, done in conjunction with Dr. Montgomery's opinion in 2012,

12

did reveal evidence of bilateral mononeuropathy in Plaintiff's arms." ECF No. 17 at 9:1–2, 11–13.

13

Plaintiff's characterization of Dr. Burns' opinion is inaccurate. To be more specific, Dr.

14

Burns did not say Plaintiff "*needed*" a new EMG as Plaintiff alleges. *Id*. at 9:1. On the contrary,

15

Dr. Burns opined that she would "*prefer* to obtain a new EMG to be certain that there is still

16

compression prior to recommending any surgical intervention," and that she would first "obtain the

17

records from California, and [then] *determine* if a new EMG is indicated[.]" AR 1000 (emphases

18

added). Further, Dr. Burns stressed that compression of Plaintiff's ulnar nerve was unlikely. *Id*. ("I

19

explained to the patient that I do not see any surgical indications given her symptoms, physical exam

20

findings, and x-rays obtained today. . . . [B]ased on her exam today I don't suspect there will be

21

[compression of the ulnar nerve].") Finally, to the extent Plaintiff claims that Dr. Burns' opinion is

22

consistent with Dr. Montgomery's assessment, even Dr. Burns opined that a diagnosis of

23

compression neuropathy of the ulnar nerve "currently does not fit with [Plaintiff's] physical exam

24

findings or subjective complaints." *Id*.

25

Based on the foregoing, the Court concludes the ALJ properly accorded very little weight to

26

Dr. Burns' opinion based on its inconsistency with clinical findings.

27
28

26

### 2.    The ALJ's Credibility Determination

The ALJ must engage in a two-step analysis when evaluating whether a claimant's testimony concerning pain, symptoms, and level of limitation is credible. *Garrison*, 759 F.3d at 1014. First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007), *citing Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). Second, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony concerning the severity of his symptoms only by offering specific, clear and convincing reasons for doing so."[17] *Garrison*, 759 F.3d at 1014–15 (internal citation omitted). An ALJ's finding regarding a claimant's credibility must be properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not "arbitrarily discredit" a claimant's subjective testimony. *Thomas*, 278 F.3d at 958 (citation omitted).

In weighing a claimant's credibility for cases involving ALJ decisions rendered on or after March 24, 2016, including the present case, the ALJ may consider Plaintiff's: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or

---

[17]    In its Cross-Motion to Affirm and Response to Plaintiff's Motion for Summary Judgment and/or Remand, Defendant "maintains that [the clear and convincing reasons] standard [used when reviewing an ALJ's decision to discredit a claimant's allegations] is inconsistent with the deferential substantial evidence standard set forth in 42 U.S.C. § 405(g) and with agency regulations and rulings . . . ." ECF No. 25 at 10, n.5. Notwithstanding, the Ninth Circuit has employed the clear and convincing reasons standard when reviewing an ALJ's decision to discredit a claimant's allegations. *See Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). This Court is bound to follow Circuit precedent.

other symptoms.[18]  SSR 16-3p (eff. Mar. 28, 2016), 2016 WL 1119029, at *7; 20 C.F.R. §§ 404.1529(c), 416.929 (c).  The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities."  SSR 16-3p, 2016 WL 1119029, at *2.  A claimant's statements about his pain or other symptoms alone will not establish that he is disabled.  20 C.F.R. § 416.929(a)(1); 42 U.S.C. § 423(d)(5)(A).  And, a claimant is not entitled to benefits under the Social Security Act unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be.  *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

In the present case, the ALJ found, at step one, that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms as described by step one of the *Garrison* analysis.  AR 28.  At step two, however, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible for five reasons:  (a) Plaintiff's testimony conflicted with the objective medical evidence and her treatment notes (AR 29); (b) Plaintiff reported improvement of her pain symptoms with treatment (*id.*); (c) Plaintiff received conservative treatment (*id.*); (d) Plaintiff's testimony conflicted with her reports of daily activities (AR 30); and, (e) Plaintiff's testimony was inconsistent with previous statements she made to her physicians (*id.*).  Plaintiff argues these were not clear and convincing reasons to discount her subjective complaints.  ECF No. 17 at 7:23–9:23.  The Court examines each of the ALJ's findings below.

a.    Plaintiff's testimony conflicted with the objective medical evidence.

When determining the extent of Plaintiff's symptoms, the ALJ must consider whether there are any conflicts between Plaintiff's statements and the objective medical evidence.  20 C.F.R. § 416.929(c)(4).  However, an ALJ may not discredit a claimant's symptom testimony and deny benefits solely because the degree of the symptoms alleged is not supported by objective medical evidence.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell*, 947 F.2d at 346–47;

---

[18]    SSR 96-7p was superseded by SSR 16-3p in March 2016.  SSR 16-3p "eliminat[es] the use of the term 'credibility' .... [to] clarify that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, available at 2016 WL 1119029, at *1 (Mar. 16, 2016).  However, both regulations require an ALJ to consider the same factors in evaluating the intensity, persistence and limiting effects of an individual's symptoms.  *Id.* at *7; SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

*Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). The objective medical evidence is a relevant factor, along with the medical source's information about the claimant's pain or other symptoms, in determining the severity of a claimant's symptoms and their disabling effects. *Rollins*, 261 F.3d at 857; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). SSR 16-3 provides that the disability "determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." That is, "providing a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015).

Plaintiff argues the ALJ referred to the objective evidence in general and, therefore, failed to provide specific reasons to discount the specific aspects of Plaintiff's testimony which establish disability. ECF No. 17 at 12:3–11. To the contrary, a review of the Administrative Record shows the ALJ carefully highlighted the inconsistencies between the objective evidence and Plaintiff's testimony, a sample of which includes:

- "On May 15, 2012, [Plaintiff] exhibited a positive straight leg raise on the left side," despite "not hav[ing] bowel or bladder problems related to her back condition";

- "Physical examinations in 2013 and 2014 show full range of motion of [Plaintiff's] lumbar spine, normal gait, full strength, intact sensation, negative straight leg raise test, and no joint deformity or swelling";

- "Testing . . . showed a positive Faber on the right causing left SI pain, negative Taber on the left, and positive Yeomans on the left, and negative on the right";

- Plaintiff "was able to heel walk, and toe walk in February 2013"; and,

- "Physical examinations in 2015 showed a nonantalgic gait, no gross neurological deficits, sensation intact to light touch, restricted lumbar range of motion, intermittent dysesthesias of the legs and the feet with sustained positions, and altered sensation to light touch on the left foot; she did not require an assistive device to ambulate."

AR 29 (internal citations omitted).

On this record, the ALJ reasonably concluded that the "[c]linical findings . . . do not support claimant's allegations and are consistent with the residual functional capacity found herein[.]"  AR 29.  Here, the ALJ cites two additional valid reasons for discounting Plaintiff's symptom complaints that are discussed below.

          b.    <u>Plaintiff failed to challenge the ALJ's finding that her pain was managed with treatment, but her argument would fail even if she had</u>.

The effectiveness of treatment is a relevant factor in determining the severity of a claimant's symptoms.  20 C.F.R. § 404.1529(c)(3); *see Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *Tommasetti*, 533 F.3d at 1040 (a favorable response to treatment can undermine a claimant's complaints of debilitating pain or other severe limitations).

As a preliminary matter, Plaintiff failed to develop this argument with any specificity and, as such, it is waived.  *Carmickle*, 533 F.3d at 1161 n.2 (determining court may decline to address on the merits issues not argued with specificity); *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) (a court may not consider on appeal issues not "specifically and distinctly argued" in the party's opening brief).  Even if Plaintiff had challenged the ALJ's finding on this basis, however, the Court finds that the ALJ provided specific, clear, and convincing reasons to support his conclusion.  The ALJ cites to various instances in the record where the Plaintiff reported pain relief:

- "The record shows [Plaintiff] complained of having frequent migraines in January 2013.  However, she also reported fairly good treatment success with Imitrex . . . .  Headache frequency was diminished with treatment, and severity also improved . . . .  Thus, this impairment is well managed with medication . . . ." (AR 26);

- "By March 2013, [Plaintiff] had an epidural steroid injection and reported 75% relief of her back pain . . ." (AR 29) (internal citations omitted);

- "Treatment notes dated November 13, 2013, show the claimant used Amitriptyline every night to help improve her sleep and decrease her chronic pain.  She reported the medication had fair ability to regulate her pain level during the night, and she was sleeping better.  She also reported improved sleep with Gabapentin . . ."; (*id*.) (internal citation omitted) and,

- "She had piriformis injections [on May 22, 2015], with some relief of her pain [reported on August 10, 2015] . . . ." (*id*) (internal citation omitted).

On this record, the ALJ reasonably concluded that Plaintiff's impairments when treated were not as limiting as Plaintiff claimed.

Notwithstanding, Plaintiff states in her brief that:

> Imitrex is an abortive migraine medication, meaning it does not prevent migraines, but is used to treat migraines after they have already begun. Plaintiff explained at the hearing that she gets migraine headaches about twice each week, and when she gets a migraine, she takes her medication and then has to lie down in a dark room until the headache goes away. . . . If there are two days each week when Plaintiff has a migraine and has to spend several hours lying down in a dark room, this would result in absences from the workplace at a level the VE testified would be disabling. . . . The ALJ erred in failing to consider that even if Plaintiff's migraines respond to the medication, she still loses several hours of time at least twice per week while she waits for the medication to take effect.

ECF No. 17 at 11:21–12:2 (internal citations omitted). This argument has no merit. A review of the administrative hearing transcript reveals Plaintiff never testified that she waits "several hours" for her medication to take effect. *Id*. at 12:1; *see also* AR 65. Moreover, Plaintiff never affirmatively identified Imitrex as the sole medication she takes to combat her migraines. AR 65. This is significant because the treatment notes to which the ALJ refers when making his adverse credibility finding mention that Plaintiff "takes amitriptyline and uses Imitrex to treat her acute symptoms [of migraine headaches]." AR 804. Therefore, even if Imitrex is used to treat migraines after-the-fact, Plaintiff may still have access to preventive medications such as amitriptyline.

Accordingly, the ALJ's finding is supported by substantial evidence and was a clear and convincing reason to discount Plaintiff's symptoms complaints.

c.    <u>Plaintiff failed to challenge the ALJ's finding of conservative treatment, and it is questionable whether her argument would succeed even if she had.</u>

Evidence of conservative treatment is a sufficient basis upon which an ALJ may discount a "claimant's testimony regarding the severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)). The Ninth Circuit has more recently cast doubt on characterizing epidural injections and physical therapy as conservative treatment. *Garrison*, 759 F.3d at 1015; *but see Hanes v. Colvin*, 651 F. App'x 703, 705 (9th Cir. 2016) (affirming ALJ's decision to reject claimant's symptom testimony, in part because the claimant's "conservative treatment plan . . . consisted primarily of minimal medication, *limited injections, physical therapy*, and gentle exercise.") (emphasis added) (internal citation omitted); *Tommasetti*, 533 F.3d at 1039 (holding that the ALJ permissibly inferred that the claimant's "pain

was not as all-disabling as he reported in light of the fact that he did not seek an aggressive treatment program" and "responded favorably to conservative treatment including *physical therapy . . . .*") (emphasis added).

Here, the ALJ found Plaintiff obtained "excellent relief" from conservative treatment consisting of "a TENS unit, physical therapy, exercise, and NSAIDS." AR 29, *citing* AR 497, 552–53, 563. The Court need not reach the issue of whether Plaintiff's physical therapy constitutes conservative treatment because, as a preliminary matter, Plaintiff failed to develop this argument with any specificity and therefore, it is waived. *Carmickle*, 533 F.3d at 1161 n.2; *Kim*, 154 F.3d at 1000. Even if the ALJ erred in characterizing Plaintiff's physical therapy as conservative treatment, however, his overall findings must be upheld because he cited two clear and convincing reasons to discount Plaintiff's credibility: her testimony conflicted with clinical findings, and her pain was managed with treatment. As explained in *Stout*, the ALJ's decision must be upheld where the mistake is nonprejudicial to his ultimate disability conclusion. 454 F.3d at 1055.

In sum, Plaintiff's failure to challenge the ALJ's findings of her conservative treatment deems any argument on this basis waived.

              d.    <u>The ALJ erred in discounting Plaintiff's credibility on the basis of her daily activities, but this error was harmless because he provided two additional reasons for disbelieving Plaintiff's testimony.</u>

The ALJ may consider a claimant's activities that undermine reported symptoms when deciding whether a claimant's testimony about her symptoms should be discredited. *Rollins*, 261 F.3d at 857. If a claimant can spend a substantial part of the day engaged in pursuits involving the performance of exertional or non-exertional functions, the ALJ may find these activities inconsistent with the reported disabling symptoms. *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012). However, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair*, 885 F.2d at 603 (internal citations omitted). "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discount a claimant's symptom claims when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina* at 1112–13.

The ALJ found that "[t]he claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  While the record does show the claimant has severe impairments, they do not appear to have significantly limited her daily activities during the relevant period."  AR 30.  In support of his adverse credibility finding, the ALJ cites to treatment records in which Plaintiff "indicated she was able to pack boxes in preparation for a move . . . [and] reported walking one mile daily for exercise."  AR 30, *citing* AR 501, 634.  Plaintiff also testified at her hearing that her new medication now causes her to sleep "19 to 20 hours" per day (AR 64), but Defendant maintains that the ALJ found "the record shows she previously exercised regularly, went grocery shopping, attended medical appointments, and walked two to three times per day."  *Id.*, *citing* AR 1086, 1094, 1342.  Defendant also argues, for the first time, that "Plaintiff admitted that her pain only occasionally interfered with many of her activities of daily living, including doing chores, yard work, socializing, exercising or having relations . . . ."  ECF No. 25 at 13:16–18, *citing* AR 690.

The Court nonetheless agrees with Plaintiff's contentions that "[n]one of these minimal activities establish an ability to sustain even sedentary activity for a full work day or work week[,] and they are not inconsistent with Plaintiff's testimony regarding her limitations."  ECF No. 17 at 11:6–9.  Indeed, claimants do not need to be "utterly incapacitated" to receive disability benefits.  *Fair*, 885 F.2d at 603 (internal citations omitted).  The daily activities to which Plaintiff testified are largely consistent with her previously reported activities with the exception of her sleeping patterns.  *Compare* AR 59–65 *with* AR 788, 1002.  As discussed in the next section, the ALJ should have considered the sedating side effects of Plaintiff's new medication in his disability determination, which would sufficiently explain the self-reported discrepancies between Plaintiff's sleeping patterns before and at the hearing.  SSR 16-3p.  In addition, the ALJ's citation to treatment records in which "the claimant indicated she was able to pack boxes in preparation for a move" fails to provide the full diagnostic picture.  AR 30, *citing* AR 501.  The second part of the referenced sentence must be emphasized, which states that packing boxes has exacerbated her symptoms.  AR 501.  It is true that Plaintiff previously "reported walking one mile daily for exercise" (AR 30, *citing* AR 634), but this is not necessarily inconsistent with her testimony at the administrative hearing, in

1    which she stated she can walk "two blocks" before taking a break (AR 62).  Further, the treatment

2    notes the ALJ references, which reveals Plaintiff "exercised regularly, went grocery shopping,

3    attended medical appointments, and walked two to three times per day," is of limited relevance

4    because this evidence is from outside the relevant adjudicatory period.[19]  AR 30; *see also* AR 1086,

5    1094, 1342; *Carmickle*, 533 F.3d at 1165.  Finally, Defendant's independent citation to treatment

6    records evidencing only occasional interference with Plaintiff's daily activities is inconsequential to

7    this analysis, because a reviewing court "cannot affirm the decision of an agency on a ground that

8    the agency did not invoke in making its decision."  *Stout*, 454 F.3d at 1054.

9        Plaintiff's testimony about her daily activities, singularly or cumulatively, is insufficient to

10   indicate that Plaintiff's capacities are transferable to a work setting; nor does Plaintiff's description

11   contradict her claims of a debilitating impairment.  The ALJ therefore erred by discounting

12   Plaintiff's reported symptoms on the basis of her daily activities.  Nonetheless, this error is harmless,

13   as the ALJ's two other reasons for discounting Plaintiff's symptom claims—that they are

14   inconsistent with the objective medical evidence and Plaintiff's symptoms improved with

15   treatment—constitute clear and convincing reasons to discount Plaintiff's symptom claims.  *Stout*,

16   454 F.3d at 1055 (finding harmless error when it was inconsequential to the ultimate nondisability

17   determination).

18           e.    The ALJ erred in finding Plaintiff's testimony conflicted with previous
               statements she made to her physicians, but this error was harmless.

19       When evaluating a claimant's symptom claims, an ALJ may consider the internal consistency

20   of a claimant's statements, and compare these statements to other existing statements or the

21   claimant's conduct under other circumstances.  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)

22   (the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying,

23   prior inconsistent statements concerning symptoms, and other testimony that "appears less than

24

25

26

27   [19]       These treatment notes are from February 19 (AR 1094), March 4 (AR 1086), and July 21, 2016 (AR 1342).  All
     of these records fall outside the relevant adjudicatory period, which runs from Plaintiff's amended onset date of
28   disability, February 2, 2012, through her date last insured, September 30, 2015.  AR 21, 48.

candid"). A tendency to exaggerate or engage in manipulative conduct during the administrative process is a permissible reason to discount the credibility of the claimant's reported symptoms. *Tonapetyan*, 242 F.3d at 1148.

Here, the ALJ found that "[i]nconsistent statements made to physicians suggest the claimant's symptoms during the relevant period were not as severe as alleged." AR 30. The ALJ pointed out that "[a]t the hearing[,] claimant reported fatigue and only being awake for three to five hours per day. *Id*. However, in 2013, Plaintiff reported waking up at 12 am, being unable to go back to sleep, feeling exhausted all day long, and crashing for hours. AR 644. In September 2015, [Plaintiff] told her physician she only slept three to four hours at night . . . . These statements suggest the claimant's symptoms have changed since the date last insured." AR 30 (internal citations omitted).

Plaintiff, however, plainly admitted during her testimony that her new medication caused her to sleep excessively. That is, Plaintiff testified that she had been sleeping 19 to 20 hours due to her new medication and, previously, she "wasn't sleeping at night [because she] was tossing and turning in pain." AR 64. Defendant claims that Plaintiff's "different interpretation . . . does not negate the ALJ's findings regarding her inconsistent statements." ECF No. 25 at 14:3–4. However, Plaintiff is not *interpreting* the record another way. Instead, she is reaffirming what she testified to at her administrative hearing: sleeping excessively "is the side effect [of Plaintiff's new medication] and [she] could choose whether to take it or not take it, so [Plaintiff] can be in pain all day or [she] can sleep all day, either/or." AR 64. Because the side effects of medication can affect an individual's ability to work, the ALJ should have considered them in his disability determination, which he did not. SSR 16-3p.

The Court therefore finds Plaintiff's previous statements regarding her sleeping patterns were consistent with her testimony at her administrative hearing, and did not form a clear and convincing basis for the ALJ to discount her credibility. However, the ALJ's error was harmless, because he cited two valid and sufficiently supported reasons for his ultimate conclusion that the claimant's symptoms and complaints should be discounted, as detailed above.

### 3.    The ALJ's Step Five Finding

At step five of the sequential evaluation analysis, the burden shifts to the Commissioner to establish that (1) the claimant can perform other work, and (2) such work "exists in significant numbers in the national economy."  20 C.F.R. §§ 404.1560(c)(2); 416.960(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).  In assessing whether there is work available, the ALJ must rely on complete hypotheticals posed to a vocational expert.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  The ALJ's hypothetical must be based on medical assumptions supported by substantial evidence in the record that reflects all of the claimant's limitations.  *Osenbrook v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).  The hypothetical should be "accurate, detailed, and supported by the medical record."  *Tackett*, 180 F.3d at 1101.

The hypothetical that ultimately serves as the basis for the ALJ's determination, *i.e.*, the hypothetical that is predicated on the ALJ's final RFC assessment, must account for all the limitations and restrictions of the claimant.  *Bray*, 554 F.3d at 1228.  "If an ALJ's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy."  *Id*. (internal citation omitted).  However, the ALJ "is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence."  *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (internal citation and quotation marks omitted).  Therefore, the ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel if they are not supported by substantial evidence.  *Magallanes v. Bowen*, 881 F.2d 747, 756–57 (9th Cir. 1989); *Martinez*, 807 F.2d at 773.  A claimant fails to establish that a step five determination is flawed by simply restating argument that the ALJ improperly discounted certain evidence, when the record demonstrates the evidence was properly rejected.  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175–76 (9th Cir. 2008).

Relying on the testimony provided by the VE, ALJ Cusker found Plaintiff could perform the "sedentary . . . , unskilled" occupations of "[o]rder clerk (DOT 209.567-014, . . . with 131,000 jobs available in the national economy"; "[c]harge account clerk (DOT 205.367-014), . . . with 19,900 available in the national economy"; and, "[c]all out operator (DOT 237.367-014), . . . with 13,600

jobs available in the national economy." AR 33. Plaintiff argues the ALJ erred by rejecting her symptoms complaints and her treating physicians' assessments in formulating his hypothetical for the VE. ECF No. 17 at 12:20–13:12. This argument is not compelling.

As explained above, the ALJ properly afforded no weight and very little weight to Dr. Montgomery's and Dr. Burns' opinions respectively. Similarly, the ALJ's decision to discount Plaintiff's testimony concerning the severity of her symptoms was supported by substantial evidence for the reasons above. In turn, the ALJ appropriately rejected the restrictions Plaintiff and her treating physicians alleged she had in the hypothetical question posed to the VE, as they were unsupported by substantial evidence. *Greger*, 464 F.3d at 973. Accordingly, the ALJ's step five finding should be upheld.

## IV.    REMEDY REQUEST

Plaintiff requests this case be remanded with instructions to pay benefits. ECF No. 17 at 13:14–28. Specifically, Plaintiff claims that "[t]his Court should so find based on Plaintiff's improperly rejected testimony and the improperly rejected opinions of Plaintiff's treating doctors, Dr. Montgomery and Dr. Burns[.]" ECF No. 17 at 13:26–28. In *Garrison*, the Ninth Circuit discussed its:

> three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

759 F.3d at 1020 (internal citation omitted).

Here, there is serious reason to doubt that Plaintiff is disabled under the Social Security regulations based on the inconsistencies in her treating physicians' opinions and in her testimony. Therefore, the elements of the credit-as-true standard are not satisfied, and a remand for immediate payment of benefits—let alone remand at all—is inappropriate.

## V.    CONCLUSION

The ALJ's finding that Plaintiff's treating physicians' opinions should be discounted is supported by their inconsistency with the medical record. The ALJ failed to support his conclusion

that Plaintiff's testimony conflicted with her reports of daily activities and statements she previously made to her physicians, and it is questionable whether Plaintiff received conservative treatment. To the extent these were errors, however, they were harmless, because the ALJ properly found that Plaintiff's testimony conflicted with the objective medical evidence and Plaintiff reported improvement of pain symptoms with treatment. The ALJ's step five finding should be upheld because the ALJ properly formulated a hypothetical to the VE only containing restrictions supported by substantial evidence.

## VI.    RECOMMENDATION

IT IS HEREBY RECOMMENDED that Plaintiff's Motion for Reversal and Remand (ECF No. 17) be DENIED, and Defendant's Cross-Motion to Affirm and Response to Plaintiff's Motion for Summary Judgment and/or Remand (ECF No. 25) be GRANTED.

DATED this 26th day of February, 2020.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).